# EXHIBIT A

IN THE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| INDIANA PROTECTION AND ADVOCACY SERVICES COMMISSION, et al., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) No. 1:24-cv-00833-TWP-TAB |
| INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION, et al., | ) ) ) ) |
| Defendants. | ) |

## DECLARATION OF CATHY ROBINSON

I, Cathy Robinson, declare as follows:

1. I am over the age of 18 and am competent to testify to the facts contained in this affidavit. Except as otherwise stated, I have personal knowledge of the matters set forth herein. If called as a witness, I could and would competently testify to the facts set forth herein.

2. I am currently the Deputy Director for the Division of Disability and Rehabilitative Services (DDRS) within the Indiana Family and Social Services Administration (FSSA) and have held this role since March 2022. My responsibilities as Deputy Director of DDRS include assisting and supporting Division Director in management, oversight and administration of all Divisional programs and implementation of strategies associated with Division vision and goals, and management of several key areas of waiver administration associated with the transition of the A&D and TBI waivers to DDRS.

3. In my role, I am familiar with and helped oversee FSSA's transition from the Aged and Disabled Waiver (A&D Waiver) to the Health and Wellness Waiver (H&W Waiver).

1

4. Prior to becoming Deputy Director of DDRS, I was the Director of the Bureau of Disability Services (BDS) since February 2015 and have almost twenty years of experience with DDRS programs. I have a bachelor's degree from Ball State University and a master of education degree from Butler University.

5. The information provided below pertains to FSSA's positions and actions in relation to the administration of Medicaid waiver services through the A&D Waiver, and after July 1, 2024, the H&W Waiver. I understand that Plaintiffs seek to enjoin the July 1, 2024 changes to the waiver as to two individual enrollees.

6. FSSA administers Indiana's Medicaid program. Indiana's Medicaid program includes its State Plan, which covers traditional Medicaid services, as well as several home- and community-based Medicaid waiver programs.

7. The federal Centers for Medicare & Medicaid Services (CMS) reviews and approves the State Plan and waiver programs for compliance with federal Medicaid laws and regulations.

8. In my role, I participated in communications between FSSA and CMS regarding the changes to the A&D Waiver and the H&W Waiver.

9. Relevant to this case, until July 1, 2024, the A&D Waiver provided in-home services, such as attendant care services, to eligible individuals, including the individual plaintiffs in this case. The Division of Aging administered the A&D Waiver.

10. Beginning on July 1, 2024, the A&D Waiver has been replaced by the Pathways Waiver and the H&W Waiver. The Pathways Waiver covers eligible beneficiaries who are aged 60 and over, and the Division of Aging administers the program. The H&W Waiver covers eligible beneficiaries who are aged 59 and under, and DDRS administers the program.

11. In my role, I worked on the transition from the A&W Waiver to the H&W Waiver and continue to oversee the administration of the H&W Waiver. I also communicated with CMS regarding FSSA's proposed H&W Waiver, including responding to CMS requests for additional information.

12. The same eligibility requirements that applied to the A&D Waiver apply to the H&W Waiver: an individual must be Medicaid eligible and functionally eligible. Medicaid eligibility is determined by the individual's disability status and family income. An individual is functionally eligible for the waiver if he meets nursing facility level of care, which means that the individual requires significant direct assistance on a daily basis due to substantial or complex medical conditions. The functional eligibility screening is conducted by FSSA through an Eligibility Screen assessment administered by a care manager with the Area Agencies on Aging (AAAs), an eligibility determination is rendered by the care manager supervisor, and the determination is sent to DDRS (or Division of Aging under the A&D Waiver) for review.

13. For an individual who meets the nursing facility level of care and is a Medicaid beneficiary, FSSA will enroll the individual in the waiver program, subject to waiver capacity. Care managers are responsible for preparing a written, person-centered service plan for each individual participant. The service plan includes the individual's chosen residential setting, the clinical and support needs as identified through the functional-need assessment, services and supports (paid and unpaid) that will assist the individual and the providers of those services and supports (including natural supports), medical and other services to be furnished, regardless of the funding source, frequency of each service the member is receiving, and the type of provider that will furnish each service. Indiana's waiver services are supplemental to traditional State Plan

services and do not replace them. This framing is reflected in the assessment and creation of the person-centered service plan.

14. The care manager submits the service plan to DDRS (or Division of Aging in the past), which reviews and then approves or denies the service plan or requests additional information. While in the past the review process allowed for automatic approval of many service plans in the system, DDRS has implemented a more manual review process for service plans. An enrollee may appeal a denial of a service plan. The approved authorization of the service plan details the number of units of waiver services to be provided, the name of the authorized waiver provider, and the approved billing code. The care manager re-assesses a waiver enrollee's functional eligibility annually.

15. FSSA sent a memorandum to providers of care management services under the A&D Waiver on March 22, 2024 providing updated guidance regarding service plan elements which require manual review. A true and accurate copy of this document is attached as Exhibit P to FSSA's response brief.

16. FSSA initiated the changes from the A&D Waiver to the Pathways Waiver and H&W Waiver in September 2022 to simplify the home- and community-based services for waiver enrollees 60 years of age and older through the Pathways Waiver and to move the 59 and under services under DDRS.

17. In late 2023, FSSA discovered a budget variance of more than $900 million in state funding and determined that a significant part of the variance resulted from increased costs arising from utilization of attendant care services by legally responsible individuals (LRIs), which include parents of a minor waiver beneficiary.

18. These discoveries led FSSA to implement mitigation strategies beginning in January 2024.

19. On January 17, 2024, FSSA issued a letter explaining its Medicaid forecast mitigation strategies. Among them, under the A&D Waiver, no new LRIs may provide attendant care services; FSSA will work with providers and families currently utilizing LRI-provided attendant care to transition to an alternative attendant care provider or to determine a transition plan to the service of Structured Family Caregiving on or before July 1, 2024; and FSSA will increase staff engagement in service-plan reviews. A true and accurate copy of this document is attached as Exhibit Q to FSSA's response brief.

20. Aside from the budget variance, these strategies were implemented in part to improve service-definition compliance with the existing federally approved A&D Waiver and to ensure FSSA's practices aligned with approved definitions, and to increase state staff engagement to ensure a person-centered, thoughtful and thorough review process for service plans. Stated differently, the service definitions in the A&D Waiver (and later the H&W Waiver) do not allow LRIs to provide attendant care and FSSA was working to bring its practices in line with these requirements.

21. In May and June, 2024, FSSA hosted several webinars and released information about changes to the A&D Waiver and the proposed H&W Waiver for recipients of the A&D Waiver, their families, and other stakeholders in an effort to help them with the waiver transition planning. In my role at DDRS, I was involved in the creating these informational webinars related to the H&W Waiver. FSSA hosted these information webinars on 5/1/2024; 5/15/2024; 5/29/2024; 6/12/2024; and 6/26/2024. A true and accurate copy of the document announcing these information webinars is attached as Exhibit R to FSSA's response brief.

5

22. Additional information was made available to recipients and other stakeholders by the beginning of May 2024 concerning the changes to the A&D Waiver, including in FSSA's "A&D and TBI Waiver Update" newsletter. For example, FSSA's May 6, 2024 "A&D and TBI Waiver Update" newsletter provides information about "[m]ore than 200 provider have become state-approved to offer Structured Family Caregiving" and a link to lists of such providers. Additionally, it answered other frequently asked questions for members and stakeholders, such as:

> Question: If I choose to transition to Structured Family Caregiving, can I access skilled care, such as skilled respite?
>
> Answer: Yes, skilled care can be accessed while an individual is receiving Structured Family Caregiving.

A true and accurate copy of this document is attached as Exhibit S to FSSA's response brief. Additionally, a true and accurate copy of an "A&D and TBI Waiver Update" newsletter dated May 20, 2024 is attached as Exhibit T to FSSA's response brief, and a true and accurate copy of an urgent reminder for A&D Waiver recipients dated May 31, 2024 is attached as Exhibit U to FSSA's response brief. In my role at DDRS, I was involved in developing the content and information contained in these newsletters related to the H&W Waiver.

23. After FSSA requested public comment on the proposed H&W Waiver, which, in relevant part, allowed LRIs to provide structured family caregiving, FSSA then submitted the proposed H&W Waiver to CMS for review and approval on May 24, 2024.

24. On June 4, 2024, CMS approved the H&W Waiver, and, on July 1, 2024, the H&W Waiver went into effect. A true and accurate copy of FSSA's announcement dated June 4, 2024 about the approval of the H&W Waiver by CMS is attached as Exhibit V to FSSA's response brief.

6

25. Under the H&W Waiver, an LRI may serve as a provider of Structured Family Caregiving. As with the A&D Waiver, an LRI may not serve as a provider of attendant care services under the H&W Waiver.

26. To allow LRIs to continue to be paid to provide care in a fiscally sustainable way, the LRI service provision allowance was made available in the H&W Waiver under Structured Family Caregiving beginning July 1, 2024. FSSA could not have implemented changes to the A&D Waiver to permit LRIs to provide attendant care services without specifying a limit on the number of hours LRIs and non-LRIs could provide this service, or introducing the inclusion of a fiscally sustainable definition of "extraordinary care." Either of those approaches would have limited which existing waiver recipients could receive such care by an LRI after July 1, 2024, and left some of the members without any option for paid care giving by an LRI. As a result, the changes to the H&W Waiver under Structured Family Caregiving allows more recipients of the former A&D Waiver to continue to receive unskilled waiver services.

27. Attendant care services provide direct, hands-on and unskilled care to participants in activities of daily living. Examples of attendant care services are assistance with personal hygiene, such as bathing and toileting, and mobility assistance. Attendant care is not skilled care. When FSSA approves attendant care, it is not with an expectation that those hours will be used for skilled care delivery. For that reason, even when LRIs performed attendant care services previously under the A&D Waiver, LRIs should have been clocking out and not being paid for attendant care services if they performed skilled care. This is the same as an LRI clocking out while their child is in a therapy appointment since the LRI is not providing attendant care during that time.

28. Structured family caregiving is an arrangement in which the waiver enrollee lives with a principal caregiver who provides unskilled daily care and support to the enrollee. As with

7

attendant care, Structured Family Caregiving includes supporting the waiver enrollee with activities of daily living, such as personal hygiene and mobility assistance.

29. A waiver enrollee may receive Structured Family Caregiving at one of three levels, which correspond to the enrollee's level of service assessment score. Persons with more significant needs are Level 3, and persons with less significant needs are Level 1. During the transition from the A&D Waiver to the H&W Waiver, the level of Structured Family Caregiving services for minor enrollees is determined by the number of attendant care hours that they were receiving. An individual approved to receive 41 hours or more of attendant care hours per week is Level 3; 21-40 hours per week is Level 2; and 1-20 hours per week is Level 1. Each level has a different daily rate of compensation.

30. The H&W Waiver includes the reimbursement rates for all services offered in the waiver program, including attendant care services and Structured Family Caregiving services. These rates are paid to the home care agency that employs the direct caretaker, and the agency pays a portion of that to the caretaker. Attendant care services are authorized on an hourly basis, and paid to providers in 15 minute units based on the hands-on services delivered, while Structured Family Caregiving services are authorized and paid to providers on a per diem basis. The service structure and compensation on a per diem basis for Structured Family Caregiving is more appropriate for LRIs and consistent with service definitions under the H&W Waiver because it contemplates that breaks may be taken throughout the 24-hour period and recognizes that LRIs may perform some non-covered activities for minors (such as parental tasks unrelated to the medical care of a child) as needed over the course of any given day and still be eligible to be paid the same established rate, regardless.

31. To facilitate the transition to the H&W Waiver, FSSA requested that care managers convene planning discussions with waiver enrollees and submit a service plan update in which enrollees indicate if they will receive attendant care services from a non-LRI or transition to Structured Family Caregiving, or other service option.

32. As of July 1, 2024, FSSA has received these transition service plan updates for most pediatric waiver recipients. Of the transition service plans for pediatric waiver recipients received, FSSA has reviewed and approved most of them. Based on current data, more than 68% of the pediatric waiver recipients who submitted transition service plans have transitioned to Structured Family Caregiving, and the remaining enrollees are receiving attendant care services from a non-LRI or have pursued other waiver and State Plan services (such as home health only, or skilled respite nursing only).

33. The H&W Waiver does currently have a wait list and there are a total of 3,845 applications on the wait list as of July 9, 2024. This wait list did not impact any of the prior members on the A&D Waiver who were transitioned to the H&W Waiver.

34. I was deposed in this case on June 19, 2024. At the deposition, I was asked by Plaintiffs' counsel: "Was there a determination at some point that it was necessary for parents and spouses to be able 18 to provide these services to their loved ones?" After objections by FSSA's counsel as to the question being outside the scope of the deposition notice, I responded "Yes." Plaintiffs' counsel again asked "Yes, there was a determination that it was necessary for some persons" to which I responded "Yes" again. I also confirmed "yes" when asked whether it was FSSA that made this determination. I understand that Plaintiffs' characterize that testimony in their brief as me testifying that at one point FSSA itself determined that for some persons it is an absolute necessity to allow LRIs to serve as paid providers of attendant care services. That is incorrect and

9

not what I meant. My testimony addressed FSSA's determination of the medical necessity of recipients receiving certain Medicaid services and not that it was necessary to permit LRIs themselves to provide such services.

35. In response to discovery requests from Plaintiffs, FSSA collected documents to produce in this case. True and accurate copies of the following documents produced by FSSA are attached as exhibits to FSSA's response brief as follows:

- Exhibit K, May 3, 2022 E.R. Eligibility Screen
- Exhibit L, April 10, 2022 E.R. Eligibility Screen
- Exhibit M, E.R. Appeal State Exhibit A, F
- Exhibit N, G.S. Care Manager Case Notes
- Exhibit O, FSSA's HCBS Provider Module

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

_____
Cathy Robinson

Executed on July 15, 2024